JULIA LA VERNIA MEAGELY, as Executrix, etc., Respondent, v. JOEL S. HOYT, as Survivor, etc., Appellant.

*Court of Appeals, February 24, 1891.*

Reversing 46 Hun, 678, Mem.

1. *Trial. Charge.*—A charge that the jury can find a verdict for damages which are wholly unproved and presumptively not suffered, is erroneous.
2. *Same. Burden of proof.*—The burden of proof lies upon the plaintiff to establish his cause of action, and no circumstances will excuse him from the obligation, and impose the duty upon the defendant of proving that the alleged cause does not exist.

Appeal from a judgment of the general term of the supreme court, affirming a judgment and an order denying a motion for a new trial.

*Homer Weston*, for appellant.

*Edw. K. Clark*, for respondent.

RUGER, Ch. J.—This was an action to recover damages for a breach of warranty alleged to have been made on sales of tallow by the defendants to plaintiff's testator. No evidence was given by the defendants on the trial, and the questions arise upon a motion to nonsuit and exceptions taken by defendants to the charge of the judge upon uncontroverted evidence. It appears therefrom that the plaintiff's testator was a manufacturer of soap, residing at Binghampton, and in prosecution of his business consumed large quantities of tallow ; that the defendants were manufacturers of that article, doing business at Syracuse. The alleged breach consisted in the mixture of silica, or sand, with the tallow, and although it did not impair the quality of the tallow, it substituted to a certain extent another substance in the place of that intended to be purchased. The defendants were a newly established firm, and between November 16, 1883, and March 13, 1884, a period of about four months, sold the plaintiff about two hundred and thirty barrels containing about sixty-seven thousand pounds of tallow, which were duly shipped to the plaintiff and were received and accepted by him in due course of transportation. About thirty different orders were given, at irregular intervals, during this period, and they were all filled by the delivery of tallow, which was received, accepted and made use of by the plaintiff in his business, without notice to the defendants of any defects therein, and without any offer to return the same, or any part thereof. The terms of the sale were cash on delivery, and the tallow was all paid for except the last three shipments of March, 11th, 12th and 13th, amounting to twenty barrels of fifty-five hundred and seventy-five pounds, and valued at $404.18.

On the receipt of the first five barrels ordered, the plaintiff inspected the tallow and found it to be in every way satisfactory. From this time to March 12, thereafter, the plaintiff received and accepted 122 barrels without inspecting or testing the same, and used their contents in his busi-

ness without any knowledge or suspicion of defects or impurities. On March 12, the plaintiff had on hand eighty-three barrels of defendants' tallow, and subsequently received twenty more, which were used by him without inspection or objection, except as hereinafter stated, and without knowledge as to impurities therein, if any. The manner in which the alleged adulteration is claimed to have been discovered was through the character of the sediment found in the kettles in which the soap was manufactured. The soap was made in two kettles of the diameter of about eight feet each, and a depth of eight and one-half feet, with a capacity of about 20,000 pounds each. These kettles are first partially filled with lye and soap, into which tallow is shovelled until they are filled. The substance is then boiled until soap is produced, which, rising to the top, is dipped out of the kettles until a sediment is reached. This sediment is then left on the bottom of the kettle, and is, and in the course of plaintiff's business was, usually cleaned out every three or four months. The kettles had been cleaned out in February, long after the use of defendant's tallow had commenced, and were then found to be free from any unusual sediment or impurities. In March, however, the plaintiff's servants discovered a difficulty in getting sufficient heat on the kettles, and were induced to clean them out for the purpose of discovering the cause of the disturbance. On this occasion they discovered more than the usual quantity of sediment, and it was of a different character from that usually found, consisting, as claimed, of sand or marble dust, to the extent of nearly one-third of the refuse material. The fact that somebody's tallow was being adulterated was thus made clear, but it was still unknown who the vendors of the adulterated tallow were, as the plaintiff had been using indiscriminately the tallow of a number of different manufacturers.

In order to determine the fact as to whose tallow was being adulterated, the plaintiff took two barrels out of twenty-

two of the lot shipped on February 18th by the defendants, and melted the tallow from them in a kettle. This process left a sediment in the kettle consisting, as claimed, of one-third sand and two-thirds insoluble soap or tallow. The plaintiff and his witnesses estimated the adulteration to amount to from ten to twenty-eight per cent of the tallow adulterated. No other test was made of any part of the tallow subsequently used, except an examination of a barrel or two made by pressing the tallow between the fingers, which was said, by that test, to show the presence of sand therein. There was also proof that after March 12th a witness discovered two or three barrels of sand in defendants' factory at Syracuse, which resembled the substance found in defendants' tallow at the plaintiff's factory. On or about March 16th, when the defendants were informed of the discovery of the alleged adulteration, they offered the plaintiff to receive back the tallow which he then had on hand, amounting to one hundred and three barrels, and to repay him the cost thereof, but this offer was rejected by the plaintiff.

The undisputed evidence showed that this adulteration was easily discoverable and was apparent to the sight and touch, as well as by other modes of examination. The plaintiff testified that he had "bought of many parties and various brands, and been accustomed to examine tallow as it came in and can distinguish good tallow from poor tallow; of these samples you show me, the one in the left hand is pure tallow; I can tell that as far as I can see it; I can see at a glance the difference in the two samples; I can see that there is trouble with the other sample, which is defendants' tallow. Aside from the sight I discover that it is impure tallow by feeling of it between my fingers." It was also in evidence that the tallow was shipped in barrels open at one end, by which the tallow was exposed to view and could be tested by the hand as well as seen.

In submitting the case to the jury the court charged them

that they were authorized to find, upon this evidence, that all of the tallow sold by the defendants to plaintiff, except the first five barrels, was adulterated, and to award such damages therefor as they should determine he had suffered, between the limit of ten and thirty per cent of the gross amount of the sales. The court also charged the jury that in determining the quantity of tallow which was adulterated they had the right to take into consideration the fact that defendants had omitted to go on the witness stand and deny the fact of adulteration, and draw such inference therefrom as to the extent of the adulteration, as they should think proper.

These directions were duly excepted to by the defendants and present the main questions arising on this appeal. The amount of the verdict rendered shows that the jury found all of the tallow to be adulterated and awarded damages to the amount of twenty-eight per cent depreciation on the entire quantity delivered, except the first five barrels.

We are of the opinion that the exceptions to the charge referred to were well taken. So far as the 122 barrels, which had been used before adulteration was discovered, are concerned, there was no evidence whatever that they were adulterated; but, on the contrary, there was affirmative evidence that a large proportion thereof was free from the admixture of any foreign substance. With reference to the balance of the tallow, there was no positive evidence that any of it was adulterated, except about three barrels. The charge was equivalent to an instruction that the jury could find a verdict for damages which were wholly unproved, and presumptively not suffered, and that any defect in such proof was supplied by the omission of the defendants to establish affirmatively that their tallow was free from foreign substances. This was so manifestly erroneous that it needs no argument to establish the error. Leeds *v.* Metropolitan Gas-Light Co., 90 N. Y. 26.

It is an invariable rule that the burden of proof lies upon

the plaintiff to establish his cause of action, and we know of no circumstance which excuses him from this obligation, and imposes the duty upon the defendants of proving that the alleged cause of action did not exist. The plaintiff may, of course, rest upon a *prima facie* case, but this requires the proof at least of some circumstance from which the existence of the actionable facts may be legitimately inferred. There is no such evidence in this case, and for the errors in the charge the judgment must be reversed.

. The defendants also attempted to raise the question whether the plaintiff had not precluded himself from maintaining an action for damages by accepting and using the property, both before and after knowledge that a part of it was not tallow, but this has been done so imperfectly that we doubt whether the question has been properly raised. There was probably enough in the evidence to raise the question whether the plaintiff was not bound, upon the contract of sale, to inspect the goods bought upon their receipt by him, and, unless there was some latent or conceded defect in them, was barred of his action by their acceptance. Coplay Iron Co. *v.* Pope, 108 N. Y. 236 ; 13 N. Y. State Rep. 480 ; Studer *v.* Bleistein, 115 N. Y. 316 ; 26 N. Y. State Rep. 400 ; Mayer *v.* Dean, 115 N. Y. 556 ; 26 N. Y. State Rep. 375.

Without considering this question, however, we are of the opinion that the judgments of the courts below should be reversed, and a new trial ordered, with costs to abide the event.

All concur.