DWIGHT BROS. PAPER COMPANY, Respondent, vs. WESTERN PAPER COMPANY, Appellant.

*April 23—May 13, 1902.*

*Sale of chattels: Warranty: Breach: Evidence: Value.*

1. Where there is an express warranty of quality of goods sold, there is no implied warranty of fitness for the special use intended, although that purpose was known to the vendor.
2. Where paper was sold on a warranty that it had a quality and strength equal to the paper which the vendee was then using, evidence that the paper purchased would not pass through certain machines used by the vendee without breaking is immaterial on the question whether there had been a breach of war-

ranty, in the absence of evidence that the paper in use at the time of the purchase would pass through said machines in good condition.

3. In such a case evidence that the amount of the output of the vendee's machines decreased and the percentage of waste paper increased when it began to use the vendor's paper, is immaterial, in the absence of evidence that the paper in use before the change was made was paper of the kind referred to in the warranty.

4. In an action for the purchase price of "No. 2 print paper" sold for $2.65 per hundred with an express warranty of quality, defendant alleged breach of the warranty and that the paper was not worth to exceed $1.10. Defendant's witnesses claimed that the paper was not worth more than its value as paper stock— forty-five to fifty cents per hundred; but they testified that it was all used in defendant's business of making shelf paper, and apparently it had all been sold, though the amount realized on it was not shown. It appeared without dispute that the paper could be used for circulars, etc., and there was testimony that the cheapest No. 2 print paper was worth $2.50. Plaintiff's witnesses testified that the paper in question was worth the full purchase price $2.65. *Held*, that defendant could not complain of a verdict fixing the value at $2.30 per hundred, as being based on mere conjecture, although no witness testified directly to that amount.

APPEAL from a judgment of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Affirmed.*

This was an action commenced in justice's court for the balance due for goods sold and delivered, amounting to $139. No defense was made in justice's court, and a judgment for the plaintiff was rendered, whereupon the defendant appealed from the judgment so rendered to the superior court of Milwaukee county, and in that court it interposed an answer admitting the plaintiff's claim, and setting up a counterclaim, and the case was tried upon the counterclaim.

The counterclaim alleged, in substance, that the defendant, a domestic corporation, was engaged in the manufacture of shelf paper in large quantities in the city of Milwaukee, and that the plaintiff, also a domestic corporation, was a wholesale paper dealer in said city; that in the winter of 1899 and

1900 the defendant, at the solicitation of the plaintiff, purchased from the plaintiff a car load of print paper, which was to be equal in quality, strength, and finish to the kind then in use by the defendant, at the agreed price of $2.65 per 100 pounds; that said car load was to consist of about two tons of paper, in sheets, put up in bundles 22x36 inches in size, and of about fifteen tons of white print paper, put up in rolls, sixteen inches in width, of the quality, strength, and finish aforesaid; that the paper in rolls was to be used exclusively for the manufacture of lace shelf paper, as the plaintiff well knew at the time of making the contract; that said paper was not to be delivered to the defendant, nor paid for, until April, 1900, and that the plaintiff warranted that the same would be fully equal, in quality, color, strength, and finish, to that then in use by the defendant; that thereafter, and some weeks before the time that said paper was to be delivered, the plaintiff notified the defendant that the car load of paper was ready for delivery, but the defendant could not then receive the same, because its warehouse was then full, and the plaintiff agreed to store said paper in its own warehouse without expense to the defendant, whereupon the defendant, without opportunity to examine said paper, and relying upon said warranty, paid for said car load of paper as agreed; that thereafter the defendant caused said paper to be delivered at its factory, and, upon attempting to use the same, found that it was deficient in quality, finish, and strength, so that it had not strength enough to be used for the manufacture of lace shelf paper, and was too light in weight, and had many breaks in the rolls, and that the output of defendant was thereby reduced more than one half, and large waste occasioned, while the defendant was trying to use said paper, and defendant was finally unable to use the same for the purpose intended; that said paper had then and now has no marketable value for any other purpose than that intended, and was not and is not now worth to exceed

$1.10 per 100 pounds; and that, by reason of the failure of the plaintiff to furnish paper of the quality and strength agreed upon, the defendant was greatly delayed in getting out its orders, and was unable to use the paper for the purpose intended, and has suffered damages in the amount of $450.

A reply was filed to the counterclaim, admitting the sale of the car load of paper, but denying all other allegations of the counterclaim.

The cause was tried before a jury. It appeared by the evidence that the defendant during the winter of 1899 and 1900 was engaged in the manufacture of shelf papers; that for such purpose it required rolls of white print paper, sixteen inches in width, and that such paper must have sufficient strength to run through certain rolls and machinery, specially designed for the purpose, without breaking, and that, if the paper was not sufficiently strong, frequent breaks would result, causing loss of time and waste of paper; that the plaintiff's agent who sold the paper to the defendant was aware of the special purpose for which the paper was bought, and he agreed that the same would be equal in quality and strength to that which he had theretofore sold the defendant as agent for Niedecken & Co., another paper house; that the paper was to be delivered March 15th, but that the plaintiff agreed to store the paper for the defendant until it wished it, free of charge; that the paper was paid for in two notes; and that the notes were paid during the month of May. The defendant's evidence tended to show that twenty-five rolls of paper were delivered April 7, 1900, and fifteen rolls May 5, 1900, and that the remaining 221 rolls were not delivered until June 18 and 19, 1900; that the forty rolls which were delivered in April and May were used without discovery of any difficulty therein, but that when the remainder of the paper began to be used, in June, the quality thereof proved to be poorer than that in use by the defendant when the con-

tract was made, and that it did not have sufficient strength to run through the machinery, but that constant breaks occurred therein, causing loss of time and waste of paper; that paper in sixteen-inch rolls was little used, and was not sold in the market, but had to be specially ordered; and that the market value of the paper in question did not exceed its value for paper stock, to wit, forty-five to sixty cents per 100 pounds.

The plaintiff by its evidence did not controvert the making of the warranty claimed by the defendant, but claimed that the paper was sold by sample, and that it was fully worth the price paid for it, and that there was a market for the same at the time of the sale and at the time of the delivery.

A special verdict was returned by the jury as follows:

"(1) Was the paper delivered by the plaintiff to the defendant of the quality and strength contracted for by the defendant? No. (2) Did plaintiff's agent, Meir, know for what purpose the defendant intended to use said paper? Yes. (3) If you answer the second question 'Yes,' was said paper suitable for said purpose? No. (4) Did the defendant, within a reasonable time after it commenced using the paper, notify the agent, Meir, that the paper was not accepted as fulfilling the contract? Yes. (5) What was the market value of said paper in the Milwaukee market at or about the time it was delivered? Two dollars and thirty cents per hundred pounds."

Upon this verdict the defendant moved for judgment in its favor for $24.33 and costs, and, in case such motion should be denied, for a new trial upon various grounds, including the grounds that the court had erred in rejecting evidence, and that the verdict was contrary to law and to the evidence and conjectural. Both motions were overruled, and judgment entered for the plaintiff for $96.40, and the defendant appeals.

For the appellant there was a brief by *May & Hamilton,* and oral argument by *A. B. May.*

For the respondent there was a brief by *Kanneberg, Mc-Gee & Cochems,* and oral argument by *A. Kanneberg.*

WINSLOW, J.   It is undisputed that the paper in question was sold to the defendant under a warranty that it was to be equal in strength and quality to paper of the same description which defendant was then using, and which had been previously sold to the defendant by the same agent when he was acting as agent for Niedecken & Co.   This court has held that, where there is an express warranty of quality of goods sold, no warranty of fitness for a particular use is implied, but that the idea that any additional warranty is expected or intended is repelled by the fact that the parties have chosen to make their own warranty in express terms. *J. I. Case P. Works v. Niles & Scott Co.* 90 Wis. 590, 63 N. W. 1013.   In this case, therefore, there was no implied warranty of fitness of the paper sold for the special use intended, although that purpose was known to the vendor; and the controlling question in the case was not whether the paper had the necessary quality and strength to pass through the defendant's machine successfully, but whether it had the quality and strength warranted, i. e., quality and strength equal to that of the Niedecken paper, which the defendant was then using.   The case, however, was evidently tried upon the idea that there was an implied warranty of fitness in addition to the express warranty.   The allegations of the counterclaim which are supposed to set forth breaches of warranty are plainly framed upon this supposition, the defendant's evidence upon the subject of breach of warranty is largely directed to the point that the paper sold had not strength enough to pass through the machines successfully, and the third question of the special verdict is directed to the same point.   Now, had it been shown that the Niedecken paper had sufficient strength to pass through the machines successfully, evidence that the paper in question would not do so would have been material and relevant to the issue, provided there was sufficient allegation of breach in the counterclaim to found it on; but, in the absence of any proof as

420        SUPREME COURT OF WISCONSIN.        [MAY

Dwight Bros. Paper Co. v. Western Paper Co. 114 Wis. 414.

to the strength of the Niedecken paper, the fact that the paper in question was too weak to pass through the machines successfully was absolutely immaterial and proved nothing. We have examined the evidence returned carefully, and find that there was absolutely no evidence showing that the Niedecken paper would pass through the machines successfully, or in any respect with better results than the paper in question. This was, in fact, the keystone of this branch of the defendant's case. All that the defendant could claim under the warranty as to strength was that the paper in question did not come up to the standard of the Niedecken paper in its ability to pass through the machines, and, there being no proof showing what that standard was, there was no foundation for any special damages resulting from insufficiency in strength.

These considerations dispose of the main question in the case. The principal assignment of error made by the defendant is that the court ruled out certain questions by which it attempted to show that when it began to use the paper in question, in June, the amount of its output was largely reduced, and the percentage of waste increased, by reason of frequent breaks in the paper resulting from its weakness. It seems to be true that, had there been either an express or implied warranty of fitness of the paper for the special use intended, there might have been a recovery of consequential damages naturally and probably resulting from its failure to fulfill such warranty, in addition to the ordinary damages consisting of the differences in value, there being evidence tending to show that paper of this kind was not ordinarily obtainable in the market. *Guetzkow Bros. Co. v. A. H. Andrews & Co.* 92 Wis. 214, 66 N. W. 119; *Cockburn v. Ashland L. Co.* 54 Wis. 619, 12 N. W. 49; 2 Suth. Dam. §§ 671, 672. But in the state of the proof the answers to these questions would not tend to show any breach of the warranty as to strength which was actually made. The warranty was

that the paper should have strength equal to that of the Nie-decken paper which was in use in February. There was no showing that the Niedecken paper was in use in June prior to the attempt to use the paper in question; hence the comparison in output or waste proposed by the question was absolutely immaterial, and the testimony was properly rejected.

There is another contention which requires notice. While, as stated, there was no proof given or offered tending to show that the paper in question was deficient in ability to pass through the machines, as compared with the Niedecken paper, there was some slight proof that it was inferior in some other respects, as compared with that paper; and thus it may be claimed that in these respects a breach of the express warranty was proven, and ordinary damages, consisting of the difference in value between the actual value and the value which it would have possessed had it been as warranted, were recoverable. The jury found that the paper in question was actually worth $2.30 per 100 pounds. There was no proof as to what it would have been worth if it had been of the quality warranted, save the proof of the agreed price which was paid, i. e., $2.65 per 100 pounds. The court evidently allowed the sum of thirty-five cents per hundred upon the whole amount sold as damages, and deducted the same from the plaintiff's admitted claim, and rendered judgment for the plaintiff for the balance. It is claimed by the defendant that there was no evidence to base the finding of $2.30 per 100 upon, and that the finding is a pure guess. The defendant's answer alleges that the paper was not worth to exceed $1.10 per 100, while its witnesses claim that it was not worth to exceed its value as paper stock, to wit, forty-five to fifty cents per 100. The plaintiff's witnesses claim that it was worth the full price paid for it, i. e., $2.65 per 100; and the defendant's contention is that the jury had no testimony on which it could base a finding that it was worth $2.30 per 100. The principle is well understood that a jury cannot base a verdict upon mere conjecture or guess, without some

evidence, and the question is not without some difficulty. There was, however, other evidence in the case which bore legitimately on the question of value, and tends strongly to prove that the defendant's claim that it was only worth what it would bring as paper stock was not credible. The paper was what is known as "No. 2 print paper." It was shown without dispute that it could be cut into flat sheets, and used for circulars, tablets, and dodgers. The defendant's manager testified that it was all used in defendant's business; part of it was run through the machine to fill orders, and most of it was cut up on a sheet cutter, and perforated for common shelf paper. Apparently, it had all been sold. What amount was realized on it does not appear, but the conclusion that it proved to be worth considerably more than its value for paper stock is irresistible. There was testimony, also, that the cheapest No. 2 print paper was worth $2.50 per 100 pounds. Doubtless the jury took all these facts into consideration, as they were manifestly entitled to do. The question of the value of real or personal property, or of services rendered, is one upon which there is always apt to be a wide difference of opinion, especially where it appears that there is little or no market for the same, as some of the testimony tends to show was the case here. Had the case stood upon direct testimony merely,—upon one side that the value was $2.65, and upon the other side that it was but forty-five cents,—the question would be more serious; but when the other circumstances named are taken into account, and the defendant, while showing conclusively that the value exceeded the estimate of its witnesses, does not choose to further enlighten the jury as to the amount thereof, we do not think it can now complain because the jury has fixed a sum to which no witness directly testified.

No other questions are raised of sufficient importance to require discussion. There appears to have been no prejudicial error in the trial.

*By the Court.*—Judgment affirmed.